# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **ABINGDON LIVESTOCK EXCHANGE, INC.,** | )<br>)<br>) Case No. 1:06CV00096 |
| Plaintiff, | )<br>) |
| | ) **OPINION** |
| v. | )<br>) |
| | ) By: James P. Jones |
| **BERT SMITH, IV, ET AL.,** | ) Chief United States District Judge |
| | ) |
| Defendants. | ) |

*Joseph B. Lyle, Hale & Lyle, Bristol, Tennessee, for Plaintiff; Steven R. Minor, Elliott Lawson & Minor, Bristol, Virginia, for Defendants Bert Smith, IV, and B4 Cattle Company, Inc.*

In this civil action seeking the unpaid purchase price of cattle sold by a livestock market, tried before the court without a jury, I find that the defendant corporation was the actual purchaser and is therefore liable. In addition, I find that both the corporation and its president are liable for the purchase price as "dealers" within the meaning of the federal Packers and Stockyards Act.

I

This action was filed by Abingdon Livestock Exchange, Inc. seeking recovery of the sales price and other damages for certain cattle sold to the alleged purchasers, Bert Smith, IV, B4 Cattle Company, Inc. ("B4"), and Mike Edwards. Edwards did

not answer the suit and was declared in default. Smith and B4 denied any liability. The parties withdrew their demands for a jury trial, and the case was tried before the court on November 18, 2008. The parties have briefed the issues and this Opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a)(1).

The plaintiff claims recovery based on the Packers and Stockyards Act, 1921 ("Act"), 7 U.S.C.A. §§ 181-229a (West 1999 & Supp. 2008), as well as breach of contract.[1] In its Complaint, the plaintiff alleged that Smith and Edwards met with Rick Barrett, president of the plaintiff, and jointly agreed that Smith would purchase cattle from the plaintiff and that Edwards would "stand good" for the purchases. (Compl. ¶ 13.) In accord with this understanding, it is alleged, cattle were purchased from the plaintiff on September 26 and 29, 2003, but the full purchase price has not been paid. The plaintiff avers that the failure to pay violated the Act and a prior order by the U.S. Department of Agriculture under the Act requiring Smith and B4 to pay

---

[1] This court has subject-matter jurisdiction under 7 U.S.C.A. § 209(b) and 28 U.S.C.A. §§ 1331, 1367(a) (West 2006).

the full price of any livestock purchased.[2] In addition, it is asserted that the failure to pay constituted a breach of contract.

In its Complaint, the plaintiff asserted that Smith, B4, and Edwards were partners or joint venturers in the purchase of the livestock or, alternatively, that Smith and B4 purchased the livestock, with Edwards as their agent, and thus they are liable for the unpaid purchase price.

## A. FINDINGS OF FACT.

At trial, the court heard testimony from Barrett, Edwards, Smith, and two bookkeepers, Judy Boardwine and Cindy Barrett. In addition, numerous documents were introduced into evidence. Based on my opportunity to judge the credibility of the witnesses and otherwise consider the evidence, the following constitutes the court's findings of fact.[3]

1. Abingdon Livestock Exchange, Inc., a Virginia corporation, operates a livestock market in Washington County, Virginia, in this judicial district, under the name of Tri-State Livestock Market ("Tri-State"). Rick Barrett is the president and

---

[2] In an earlier Motion to Dismiss, the defendants asserted that primary jurisdiction over the causes of action based on the Act resided with the Department of Agriculture, but I disagreed and denied the motion. *Abingdon Livestock Exch. v. Smith*, No. 1:06CV00096, 2007 WL 3146504, at *2 (W.D. Va. Oct. 26, 2007).

[3] The parties have submitted post trial briefs and proposed findings of fact.

manager of Tri-State. There is a sister corporation, also managed by Barrett, named Abingdon Stockyard Exchange, Inc. ("Abingdon Stockyard"), which operates a separate livestock market in the same county. Each market is in the business of selling by auction livestock that has been consigned to it, for which the market receives a commission.

2. Tri-State holds cattle auction sales on Fridays and, in the fall, on Mondays. Abingdon Stockyard holds such sales on Saturdays. The consignors of cattle are paid by the market immediately after the sale in the amount of the purchase price for the cattle, less the market's commission. At the end of the day's sale, each purchaser of cattle is given a "Recap," which is a document prepared by the market listing the number of head of cattle purchased, their total weight, the average price per hundred-weight bid, and the amount owed. The purchasers of the cattle are required to make prompt payment to the market of the full purchase price. Prompt payment to the market is important, in light of the fact that the market pays the consignors on the day of the sale.

3. Cattle are purchased at the markets for different reasons. Some buy for others, based on specifications of the ultimate purchaser, and are known as "order buyers"; others buy to immediately resell at other markets for a profit; still others buy to feed the cattle and later resell them when they have gained weight.

4. Smith and Edwards are experienced buyers and sellers of cattle. Both have dealt for years with Barrett at Tri-State and Abingdon Livestock. Edwards normally purchases small quantities of cattle, generally of a lower quality. Smith was employed as an order buyer for approximately ten years by a large national livestock company and in 2001 went out on his own, purchasing cattle. At that time he established a Virginia corporation, B4, which bought cattle from livestock markets, including Tri-State, and fed them at commercial feed lots for later sale to meat packers. During all of the times relevant in this case, Smith was the sole shareholder, director, and officer of B4, and all of his cattle dealings with the plaintiff were on behalf of B4. On October 31, 2002, an administrative law judge of the U.S. Department of Agriculture, acting on behalf of the Secretary of Agriculture, issued an order against Smith and his company B4, directing them in connection with their activities subject to the Act, "to cease and desist from failing to pay the full purchase price of livestock."[4]

5. Because Barrett had received several bad checks from Smith for cattle purchases, in early 2003 he told Smith that he could no longer buy cattle at the markets. Thereafter, for several months, Barrett noticed that Edwards was buying

---

[4] A copy of this administrative order was not introduced at trial, but its pertinent terms were recited in the Complaint (Compl. ¶ 11) and admitted by the defendants in their Answer (Answer ¶ 11).

- 5 -

more cattle than was his usual practice and he suspected that Edwards was buying for Smith. Finally, Smith and Edwards met with Barrett, and proposed that if Barrett would allow Smith to again purchase cattle, Edwards would "watch things" and "stay on top of things" and help make sure that the markets were paid. Barrett accepted the proposal, and he understood that this was Smith's "deal, with [Edwards] overseeing it." He was afraid to do business with Smith, but was persuaded because Smith was a large cattle buyer. Smith and Edwards agreed between themselves that Smith would handle all of the details of the cattle purchases, and for his assistance in providing "credibility" for Barrett's benefit, Edwards would receive a portion of the advances paid to Smith by feed lots.

6. Barrett directed that a new account be opened for the new arrangement, and Edwards was given a different personal account number.[5] At the suggestion of Smith, the new account was called "Oak Grove Cattle Company," although it was referred to on the written records of Tri-State as "Mike Edwards" or as "Mike

---

[5] The new arrangement was also referred to as Account No. 6, which was also the number given to Edwards' former personal account. Edwards' personal account was changed to Account No. 100. Edwards continued to purchase a small number of cattle on his personal account at the Saturday sales conducted at Abingdon Stockyard. Edwards also purchased cattle at the Saturday sales for Smith.

Edwards/Bert Smith IV."[6]  Edwards owned a farm called Oak Grove, and Smith felt it was helpful to use that name in the business.

7.     Smith then began purchasing cattle again at both markets.  The actual bidding on the cattle was primarily by Smith's father, Bert Smith, III, also known as "Daddy Bert" or "Big Bert," and by Smith's brother, Alex Smith, or by Smith himself.  Smith's father, brother, or one of Smith's employees would usually fill out "load cards," supplied by the markets, showing where the cattle purchased by them were to be loaded on cattle trucks.  Most of the time Smith or his father would pick up the Recap following each day's sale.[7]  In all of these activities, Bert Smith, III, and Alex Smith were acting as agents of B4.

8.     Following the new arrangement, purchases were charged to the new account.  Many of the payments were by checks from third parties, some of which

---

[6] A similar account was opened at Abingdon Stockyard, but it was referred to as Oak Grove Cattle Company.  There is no evidence that the accounts were understood to refer to different arrangements and I find that it was simply an oversight that the accounts at both markets were not referred to as Oak Grove Cattle Company, as Smith requested.

[7] A Recap covering one of the days in question in this case was later voluntarily signed by Edwards, although the original Recap had been given to Bert Smith, III, after the day's sale.  When Tri-State failed to receive payment, and could not get in touch with defendant Smith, Tri-State's then-attorney advised Barrett to obtain Edward's signature on the Recap.  I find that this circumstance does not indicate that Tri-State or Edwards considered that B4 or Smith was not liable.  Tri-State was merely following the advice of its attorney in seeking to recover the money owing to it and Edwards was attempting to be helpful.

- 7 -

were checks payable to Edwards, which he in turn endorsed to one or the other market. Certain of these checks bounced, and Barrett's wife, who was a bookkeeper, contacted Smith directly, who said that "he would take care of it" and B4 paid the checks by wire transfer.

9. At the cattle sales held at the Tri-State market on Friday, September 26, 2003, and Monday, September 29, 2003, Smith's father did the bidding. At the Monday sale, he asked that the purchases be charged to Edwards' personal account, although that was not authorized by Edwards and the purchases were actually made for the Oak Grove Cattle Company account.[8] On the next sale day, Smith's father began bidding, but Barrett soon learned from his office that checks in payment of earlier sales had been returned, and he discontinued any further bidding by Smith's father and the cattle that he had purchased were resold without any loss to Tri-State.

10. Tri-State was not paid when due for the purchases of September 26 and 29, and after credit for payments made prior to suit, the total principal amount owing on account to Tri-State is $502,765.74.[9] All of the cattle purchased, with a few

---

[8] The cattle purchased that day were not moved promptly from the site and Tri-State incurred some cleanup costs with reference to these cattle, which Barrett properly charged to the Oak Grove Cattle Company account.

[9] This represented the purchase of 740 head of cattle on September 26 for a total purchase price of $363,541.60, and 449 head of cattle on September 29 for $293,384.14.

- 8 -

exceptions for cattle who were culled, were sent to commercial feed lots in the Midwest and were sold from there to meat packers.

11. Once payment had not been made for the September 26 and 29 purchases, Mrs. Barrett, on behalf of Tri-State, contacted Smith, who assured her that payment would be made when the cattle were resold. On October 30, an attorney for Smith sent her drafts of legal documents by which B4, as "debtor," granted a security interest in the cattle to Barrett and Edwards, subject only to the possessory liens of the feedlots where the cattle were located. These documents were never executed, however. In November, Smith sent Mrs. Barrett two cashier's checks for a total of $27,902.43, payable to Edwards and Barrett, which funds he said came from payment by a feed lot. Mrs. Barrett asked Smith why Edwards' name needed to be on the checks, and he told her that it was because Edwards was a "stockholder." These checks, and others like them received from B4 over the next few months, were on the account of Abingdon Livestock, and paid off Oak Grove Cattle Company's indebtedness to that market.[10]

---

[10] There were additional amounts of $110,000 paid by B4 in 2004 by cashier's checks that were credited to the Tri-State account. In 2005 and 2006 additional payments in the total amount of $45,000 were made, but the parties stipulated that these 2005 and 2006 payments were made in connection with a failed settlement and cannot be considered as an admission of liability.

- 9 -

12. Tri-State borrowed money to cover the indebtedness resulting from the Oak Grove Cattle Company purchases and paid interest at the rate of 4.5% on that indebtedness, which interest amounted to $143,337.72. It also was required to mortgage its property to secure the indebtedness and paid $4,000 for a property survey necessary for the mortgage.

13. Tri-State understood that Smith's dealings at all times relevant in this case were on behalf of the corporation, B4.

14. B4, through its agents, was the purchaser of the cattle at Tri-State on September 26 and 29, 2003.

## B. ANALYSIS AND CONCLUSIONS OF LAW.

The defendants principally contend that they are not liable to Tri-State in this case because Edwards was the purchaser of the cattle in question and resold them to the defendants and thus the defendants are answerable, if at all, only to Edwards for the unpaid purchase price. Of course, there is certain evidence that supports that theory, including Smith's testimony at trial of his intent and understanding, as well as certain testimony of Edwards, who stated that he "was going to be the in-between man" and that he and Smith "wasn't in business together." However, a party's characterization of its business status is not binding. While Smith may have had a secret intent that he and B4 would be insulated from any liability by Edward's

involvement, it is the objective manifestation of intent in a contractual relationship that governs. *See Chandler v. Kelley*, 141 S.E. 389, 392 (Va. 1928) ("The intention of the parties . . . is gathered from what was actually done or agreed by the parties, not from what they may have privately meant or supposed they meant.") (internal quotation omitted).

The greater weight of the evidence shows that the arrangement here, as reasonably understood from the words and conduct of the parties, was that Smith, acting for B4, would be allowed to purchase cattle from Tri-State, with Edwards acting as Smith's agent to help facilitate timely payment to Tri-State.

It is also argued by the defendants that if the contract of purchase was breached, only the corporation B4 is liable. I agree. The evidence in the case is that Smith was acting at all times on behalf of his corporation. Barrett conceded in his testimony at trial that all of the transactions involving Smith were done in the name of B4. There is no evidence from which the court could pierce the corporate veil and hold Smith individually liable for breach of contract. *See Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987) (holding that the burden of proof lies with the party seeking to pierce the corporate veil by showing that the corporate entity was the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally, in order to disguise or obscure fraud or wrong doing). Such

proof is necessary "even when the corporation is owned totally by a single person." *Barnett v. Kite*, 624 S.E.2d 52, 55 (Va. 2006).[11]

Of course, Smith spoke on behalf of the corporation in the dealings with Barrett and the trial testimony was replete with references to "Smith" as having purchased cattle or promised to pay for them, but that testimony is not inconsistent with the fact that Smith was acting in his capacity as an agent of B4.[12] The final statement of account introduced at trial by Tri-State contained the name of Smith as well as Edwards and Judy Boardwine, the bookkeeper, testified that she had been told by Barrett to place Smith's name on the account. However, there was no consistency with naming the accounts. The Recap for September 26, 2003, was in Edwards' name alone, for which Barrett had no explanation, and Barrett's wife, who kept the books at Abingdon Livestock and assisted with the bookkeeping at Tri-State and sought collection of the present indebtedness, put the same buyer's account under the name of Oak Grove Cattle Company. Barrett admitted at trial that his was "a real loose company," and the facts certainly bear that out.

---

[11] For example, there was no evidence that B4 was grossly undercapitalized and could not pay its costs of doing business, or was otherwise a sham. *See O'Hazza v. Executive Credit Corp.*, 431 S.E.2d 318, 321 (Va. 1993).

[12] As Judy Boardwine, a bookkeeper for Tri-State, testified, "B4 is Bert Smith, IV."

- 12 -

What is clear, however, is that the plaintiff has proved by a preponderance of the evidence that Smith, acting for his corporation B4, purchased the cattle at issue in this case from Tri-State. Accordingly, B4 is liable to Tri-State on the breach of contract cause of action for the amount of the unpaid purchases, as claimed.

As to the causes of action based on the Act, the defendants contend that they are not liable because they are not "dealers" within the meaning of the Act, and thus did not violate the Act or the Department of Agriculture's order by failing to pay for the cattle purchases when due.

The Act provides that

> If any person subject to this [Act] violates any of the provisions of this [Act], or any order of the Secretary under this [Act], relating to the purchase, sale, or handling of livestock . . . he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

7 U.S.C.A. § 209(a). A "dealer" under the Act is defined as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." *Id*. § 201(d). A dealer as defined in the Act is required to register with the Secretary of Agriculture, *id.* § 203, and, among other things, is required to make full payment of the purchase price for livestock purchased before the close of the next business day, *id.* § 228b(a).

Smith and B4 argue that they did not act as dealers because they sent the cattle purchased to commercial feed lots before selling them to meat packers and thus are more like the farmer or rancher who improves his cattle by feeding them, and then sells them into commerce.[13] The defendants' position is that as long as they were not buying cattle for immediate resale, but only in order to feed and then resell them, they were not dealers and have no liability under the Act.

Based on the facts of the case, I find that both Smith and B4 were acting as dealers within the meaning of the Act. There is no question that the essence of the defendants' business was buying large quantities of cattle from various sources for resale. The fact that most of the cattle were not resold immediately, but only after the cattle had been fed for a few months at commercial feed lots, does not change the defendants' proper statutory characterization as "dealers." *See United States v. Rauch*, 717 F.2d 448, 450 (8th Cir. 1983) (holding that where cattle were purchased with the intent to resell to slaughterhouse, and not to increase the buyer's herd, the buyer was a dealer within the meaning of the Act.)

Although the corporation B4 is the only defendant liable under the plaintiff's common law breach of contract claim, the Act makes Smith, as B4's agent, also liable as a dealer. *See* 7 U.S.C.A. § 201(d); *United States v. Agnew*, 878 F.2d 219, 220 (8th

---

[13] Smith characterized himself as a "cattle feeder."

- 14 -

Cir. 1989) (holding that even if a dealer is acting in the capacity of agent for a principal bonded in compliance with the Act, the unbonded agent is not relieved from liability.) As the facts show, Smith was actively engaged as a dealer in the transactions that are the subject of this case and even though he was acting as the agent for a disclosed principal, B4, he is personally liable under the Act.

In addition to the unpaid purchase price, Tri-State also seeks prejudgment interest, or, in the alternative, additional damages resulting from its borrowing of funds to make up for the defendants' default in payment. (Pl.'s Post-Trial Mem. 9.) I find that prejudgment interest is appropriate and sufficient to adequately compensation the plaintiff.[14]

II

For the reasons stated, judgment will be entered against the defendants, jointly and severally, in the sum of $502,765.74, with prejudgment interest on such amount from September 29, 2003.

---

[14] The defendants, while denying any liability, agree that prejudgment interest at the rate of 4.5% would be appropriate to make the plaintiff whole. (Defs.' Post-Trial Mem. 5.)

- 15 -

DATED: January 27, 2009

/s/ JAMES P. JONES
Chief United States District Judge